Our final case this morning, while we are waiting for counsel to get settled, is Byrnes v. St. Catherine Hospital, No. 243149. Mr. Byrnes. Thank you. May it please the Court, my name is Boyd Byrnes and I represent the appellant, Dr. Matthew Byrnes. The central question in this Title VII retaliation case is whether defendants met their summary judgment burden by showing there is no genuine issue as to any material fact and that they are entitled to judgment as a matter of law. Defendants can't meet that burden because the evidence here, when viewed in Byrnes' favor, with all reasonable inferences in his favor, is sufficient to state a prima facie case and to show that defendants stated reasons for their adverse actions against him were protectional. This conclusion is supported by numerous prior decisions by this Court with factual parallels as cited in our briefs. Dr. Byrnes received his medical degree from the University of Kansas. He completed a fellowship at Washington University in St. Louis. He was on the staff at the University of Minnesota before coming home to Kansas for family reasons in 2012 and taking a job with the defendants who jointly employed him. Throughout his 8-year employment with the defendants, his performance reviews, his quality reviews, the objective care quality data metrics were good and met or exceeded expectations. But in August 2019, Byrnes filed a formal written complaint to report another doctor's sexual harassment of nurses. Defendants did not follow their investigation procedures and policies. They did not conduct a proper investigation. And the investigator told other doctors, including the subject of the complaint, that Byrnes had filed a false complaint. However, defendants did not dispute in this case that Byrnes filed the complaint in good faith. And the record evidence shows that the allegations that he made did, in fact, have a valid factual basis. In September of 2019, the chief of surgery reached out to Dr. Toni Green-Sheetwood, who was the group VP and physician executive, and she expressed concern that she had been told that Byrnes had filed a false complaint. In October of that year, Green-Sheetwood met with Byrnes to close out the complaint and told him that it had no merit and it was being dismissed. Byrnes told her that the nurses who had been sexually harassed but not actually interviewed wanted to talk to her so they could substantiate the complaint, but she refused to talk to them. Byrnes wrote to her in a text and said he was frustrated for himself and for the nurses. In January, Byrnes was asked to undergo a psychological evaluation for the stated reason that he had filed a false complaint. He complained that this was retaliation and the request was withdrawn. Then on January 30th of 2020, Byrnes called Green-Sheetwood to let her know that Kessler, the doctor who had been the subject of the sexual harassment complaint, had retaliated against him by filing a false report to the Kansas Board of Healing Arts. That was the last communication between Green-Sheetwood and Byrnes until February 12th when she fired him. As this panel knows, Title VII cases are analyzed under a three-step burden shifting analysis under which the plaintiff has a light, not onerous burden to state a prima facie case. Defendants must then state a non-retaliatory reason for the adverse action, and if they're able to do so, the plaintiff must identify evidence from which a jury could infer that the defendant's stated reason is pretextual. With regard to Byrnes' retaliation complaint with respect to his discharge, the defendants argue that Byrnes cannot state a prima facie case due to the lack of causation because the two executives who had to formally approve of the termination were not aware of his protected activity. However, this case falls squarely under the cat's paw doctrine, which states the prima facie burden of causation is satisfied when a subordinate who has knowledge of the protected activity makes a recommendation that influences the official decision maker to act. This case is classic cat's paw. Greensheet not only knew about, she was at the center of the controversy over Byrnes' protected complaints. Counsel, I'm sorry to interrupt you. This is only with regard to an alternative ground to affirm, right? Because the district court on the termination claim assumed arguendo that there was satisfaction of a prima facie. Correct, yes. Yes, that is absolutely correct, Your Honor. The district court assumed without specifically finding, but they've raised that issue, so we wanted to proactively address that. And the point being that this is a classic cat's paw case. This is a pretext issue on appeal, correct? Correct. Correct. And with respect to the post-termination activity, there is a question with regard to the prima facie case. So let's just jump right into pretext because that is the central issue of the case. This court has said many times the pretext may be shown by evidence of weaknesses, inconsistencies, or contradictions that the employer's stated reason for its actions are unworthy of belief, and that pretext evidence can take a variety of forms, although the plaintiff only has to show pretext in one way. Defendants in the district court referred to Byrnes' presentation of this evidence as a spaghetti-on-the-wall approach to see which one will stick. But this court has instructed many times the court should not look at each piece of evidence in isolation. Rather, they're obligated to consider pretext evidence in its totality. And here the pretext evidence takes many of the forms that this court has historically recognized are adequate evidence of pretext, each one of which is sufficient to show pretext in and of itself. And when this evidence is viewed in its totality, as this court says that it must be, there's no doubt. Well, the district court seemed to think that the evidence regarding the investigation, whether the investigation was reasonable or unreasonable, was a critical factor on pretext. And in fact, as you well know, at one point the district court said, so at bottom, a single phone call is the most important event to evaluate pretext here, in reference to the January 30 phone call. So far, so good? Well, that's what the district court said, correct. We would disagree that that's so good, but that's what the district court said. No, I'm just asking if I got it right. Yes. Have I got it right so far? That's what the district court said, correct. Okay, okay. So that sets up the question. What I'd like to ask you is, Dr. Burns' call to Dr. Green-Cheatwood. Correct. On January 30, didn't Dr. Green-Cheatwood's e-mail report of that call to Mr. Sabe, the general counsel, show that Dr. Burns had an opportunity there and then to discuss the anonymous complaint against him? Well, she did send that communication, as you indicated, but we would disagree that that was a fair and— Dr. Burns didn't discuss anything with her other than to inquire as to whether or not she knew that he had been investigated by this other doctor. This was new information that was coming in. Dr. Burns became aware that Dr. Kessler had filed a report. Right, and she knew about it and didn't tell him that, and they did not get into the facts of the earlier issue. That's absolutely correct. It was from Dr. Burns' perspective. This was new information. He wanted to make sure she was aware about it, and he said, I want you to know that there's been a complaint filed with the Kansas Board of Healing Arts. It was—he specifically said, this is retaliation against me by Dr. Kessler, who is the subject of my sexual harassment complaint. And at that point, there was no discussion. She asked him no questions. There was no digging into, well, what was the reason for this? Why did you do that? It was just he said there is a false complaint made. I want you to know that it was retaliatory. Those things are false, and I can explain and show why they're false. At that point, he wasn't aware of or thinking there was any investigation by the hospital against him. Counsel, I really wasn't done asking about this.  What I wanted to know is, does the record show that Dr. Green-Cheatwood had seen the complaint at the time of that call? Or was this the first that she'd heard about it? I don't recall if—to my understanding, that was the first she was aware of it. I don't want to misrepresent— Aware of what? Of which? The complaint against Kessler or the complaint against Burns? Yeah, the complaint against Burns. Was she aware of that? The complaint that was filed with the Board of Healing Arts? Yes, yes. I'm sorry, I don't recall if Mr. Sabe or somebody else had previously told her about it, but my understanding and recollection is that was the first she even knew about it. All right, all right. What caught my eye about the call was the follow-up email that Dr. Green-Cheatwood sent to Mr. Sabe. And in that email, she lists some detail about the complaint. She says there were 10 items. She describes what many of them were. She talks about how Dr. Burns considered this retaliatory but also denied. And my question is whether—what impact that evidence has relative to your argument that the follow-up investigation Mr. Sabe initiated was inadequate and unreasonable. In other words, if I understand your argument, it's because they didn't interview him. They went out and they interviewed a bunch of other folks. Correct. They didn't interview him. But there was a conversation, at least on January 30, and the district court thought that was significant in favor of the hospital, right? Yes, it was a short—we know it was an eight-minute conversation, so we know it was very short. The summation she gave came from—I believe that came from the report after it was forwarded to her. It wasn't—I don't believe it was discussed in that level of detail, according to the record. But by the time she forwarded it on to Sabe, she was trying to summarize some of the things that were written in the complaint. That didn't mean that those were all discussed between her and Burns. And, in fact, Burns just simply said these things in the complaint are not true, but there was no follow-up, there was no investigation. And then later— Okay, I just want to make sure I'm understanding the sequence here. So when Dr. Burns called her, that's the first time that Dr. Green-Sheetwood had heard about the complaint to the board. Correct. All right, so they have this eight-minute conversation. And at some point after that, same day, she sends the email to Mr. Sabe. And what I'm hearing from you is that in between the phone call and the email, she had received and reviewed the complaint. Correct. And, again, that was just one piece of pretext evidence in this case, is there's significant pretext evidence as established by the prior precedents of this court. The defendants had numerous shifting, inconsistent, and abandoned reasons about why they terminated Dr. Burns. When he asked at the time of termination—and let me back up. There was no actual documentation about the reason for termination that was ever made at the time the decision was made. And when he was informed of the termination, he specifically said, why am I being terminated? And the response from Green-Sheetwood at that point was, it's for no cause. And later, only after Dr. Burns filed the complaint of retaliation with the EEOC, did we first hear some reasons from the defendants in which they claimed that there were two reasons, the most important or the primary one being halting the peer review process. But by the time we got to discovery and summary judgment, they abandoned that reason because it was exposed as being obviously untrue, and they knew it wasn't true at the time and couldn't have relied on that reasonably. I'm going to go ahead and reserve the rest of my time for rebuttal. Thank you, counsel. Good morning. May it please the court. My name is Richard Olmsted, and I'm appearing today on behalf of Centura Health Corporation, which is now Common Spirit Health, in St. Catherine Hospital. I'm joined at council table by Lisa Martin, my co-counsel. I'd like to first address the timeline that was discussed during plaintiff's opening argument. January 30th, when Dr. Burns made the call to Dr. Green-Sheetwood, Dr. Green-Sheetwood had no knowledge of the KBHA complaint. She had knowledge that a complaint had been filed by somebody against Burns. No. What she had knowledge of was that we received, the hospital received, a subpoena from the KBHA requesting information about Dr. Burns. There was no indication that a complaint had been filed. We were left to guess what it was. How could you get a subpoena without knowing something had been filed? Well, it was an investigation that was being conducted by the KBHA. Whether that was prompted by a complaint or some other action, we don't know. And we view the evidence favorably to Dr. Burns. Correct. Correct. We do have a timeline of when the hospital learned of the complaint and received it for the first time. It was a February 3rd email from Mr. Byers' partner, Alex Schulte, who was representing Dr. Burns at the time, in a related but different dispute with the hospital. So you're going to disagree with Mr. Byers, who said that Dr. Green-Sheetwood had received the complaint before she wrote the email? Yeah. Vehemently disagree. You would disagree. The two of you are in disagreement. Yeah, there is. Because where this court can resolve that disagreement is, there is no evidence in the record to suggest that the hospital received the complaint immediately after the call with Dr. Green-Sheetwood. Why does that, in light of the discussion about it, why does it really impact the decision? Because, as I understand the evidence from Dr. Burns, is for every single investigation with regard to the quality of care, the hospital asks the obvious question. You know, there's a complaint about a thyroidectomy. So what do you make of it, Dr. Burns? So what's your side of it? And so he initiates, as Judge Kelly said, a call to Dr. Green-Sheetwood to say that there's been a complaint by the Kansas Board of Healing, whatever, Authority, and then, as you pointed out to Judge Matheson, I think, or somebody did, that Dr. Green-Sheetwood then recounts 10 complaints or 10 different events, none of which was recounted by Dr. Burns in this brief eight minutes. He doesn't give her any arguments about, you know, the details of the allegations or his side of it. So his argument for pretext is, whether she knew about a complaint or not, didn't know about a complaint, that they ultimately terminated him, in part based on competency of care, without ever in making inferences about deficient quality of care, for example, with a thyroidectomy, without ever asking him, why did you do a thyroidectomy? And coupled with all of the other arguments, well, if they're going to refer that to the board, why didn't they refer to the co-surgeon to the board? So what about that? Regardless of what Dr. Green-Sheetwood knew or didn't know before January 30th, why isn't that at least valid evidence of pretext? Well, it's not valid evidence of pretext because the Court has told us in almost identical situations it's not evidence of pretext. What's not evidence of pretext? The fact that they only talked to… Everybody else, what's your version of the allegation of incompetent care? We're not going to ask you. We've said that that's not evidence of pretext? That's correct. Where? In Riggs versus AirTran Airlines, you had almost identical factual patterns. In Riggs, there was an event that occurred with a group, a Mormon choir group, that was boarding an airline, and they experienced rude customer service from multiple members of the AirTran staff. The supervisor did a cursory review with the employees that day, the day of the event, and got their side of the story, or at least got their impression of the events. Three days later, the travel agent for the group complained directly to AirTran. That complaint was escalated to the supervisor to investigate. She interviewed everybody else that was working the day of the event, but did not interview Ms. Riggs, who was the target of the complaint. And there were complaints by other customers? Correct. Did not interview Ms. Riggs as part of the complaint. Well, let's go back to the facts of this case. First, Dr. Burns is contracted by the nurses and say, this fellow has been doing stuff he shouldn't do. They don't interview the nurses because they say, well, the supervisor wasn't there, and we can't interview the nurses if the supervisor isn't there. They didn't interview Dr. Burns because I don't know why. He didn't have a lawyer with him. The next thing that happened was this call to Dr. Green-Cheatwood. It lasted eight minutes, and he denied, said it was fabricated by Dr. Tesla. The investigators never interviewed Dr. Burns. It just sounds like they were out to get Dr. Burns because he had put the finger on Dr. Kessler for harassing the nurses and that they were covering up like nobody's business. If I could address that. What you're talking about are two separate investigations, and I think it's important that we make a clarification here. Well, wait a minute. One is dependent on the other. Bern Kessler never was taken to where it should have been taken, but the complaint by Dr. Kessler, it turned out he's the one that made it, was haphazardly investigated but never talking to Dr. Burns, and the conversation he had with Greenwood did not give any of the underlying facts, and that's pretty clear from the record. And what this court said in Riggs was that although allowing Ms. Riggs to complete her side of the story would seem to be the most fair way of addressing the situation. Well, the most fair way to do it is to talk to the person that's being accused. Correct. Which they didn't do. And then the court went on to hold, we cannot say that the investigator's failure to do so in these circumstances constitutes a disturbing procedural irregularity. And that's the standard here. Counsel, I think the critical words there are in these circumstances. All right? Now, there's a difference here in that they not only failed to interview Dr. Burns, they failed to interview the nurses, and that distinguishes this from Riggs, among other things. Yeah, and here's who they did interview. They interviewed the chief of medical staff. They didn't interview the nurses. They did not interview any nurses. All right, and are you saying that as a matter of law, that an unreasonable investigation can ever be evidence of pretext? No, it can if there are disturbing procedural irregularities. Well, wasn't there a disturbing procedural irregularity here in that they never interviewed the person that they're going to fire? Well, based on there's not a policy that requires the interviews? There's no evidence in the record? As a matter of policy, it's a question of in the circumstances, is this a reasonable investigation or is the investigation so unreasonable that it undermines the reasons that the employer has given for termination? I don't think so in this case because the reasons given for termination, if you look at the interviews that were conducted, Dr. King provided eyewitness testimony of Dr. Burns being 150 miles away from the ICU while on call. Wait a minute. So now we're going to switch. It's no longer about competency of care. Now we're going to talk about abandonment.  All right, and where is that? So what about the testimony that he provided that he always had someone cover? That's number one. The second part of the question is what about the undisputed testimony that it was reported that he was seen drinking, which turned out to be not true. He was ordering grinders. There was no evidence that he was drinking. So now none of that makes its way into the EEOC statement from the hospital. So what about these disturbing inconsistencies by the hospital about this hearsay report that he was 150 miles away drinking, that just wasn't true? Well, I'll address each of those. So three points. One, the 150 miles away, that came from an eyewitness observation from Dr. King. Okay, so you relied on it. That's really not true. Right, Dr. Burns saying he always got somebody to have him on call. That came in the reply after it was raised for the first time because initially he denied that that ever happened. So then he says, well, I always had somebody on call. So what we have is testimony from Dr. King that says that's not how the call service works. If you're on call and you have somebody else cover for you, you give the call service that doctor's name. So when you call the call service, they will say, oh, this doctor is the one who's on call. The call service only knew to reach Dr. Burns, who was 150 miles away. In light of this dispute, on your motion for summary judgment, we view the evidence favorably to the hospital because Dr. King said this is how it's supposed to work, and we should credit Dr. King's characterization that he wasn't drinking, he wasn't abandoning the patients, but he failed to notify the call center. All he did was notify the person that was filling in for him. No, I think your role in this is not to sit as a super personnel department. Your role is to decide whether the decision makers or the investigators possessed a reasonable good faith basis for believing the information that was provided to them. Well, didn't they also say that they thought that this had all been investigated before they got into it, and they made their decision without any further investigation at all, just on the statements that they heard, and they assumed that somebody had done the work of talking to Dr. Burns? The decision maker, Scott Lichtenberger, testified that he assumed. That's where you get into the cat's paw theory. Which is, I think, also a good way to go back to the Riggs case. In the Riggs case, the supervisor, or the person who made the decision to terminate, also said that it would have been best practice to have interviewed the employee. But I want to get back. I didn't answer the next two questions that you asked, Your Honor. The second one was the issue about drinking.  Peter Sabe, if I give you the sequence of depositions here, I think it's important. Peter Sabe, the general counsel, testified on November 3rd. The corporate deposition was taken on November 6th. In his deposition, Peter Sabe said, what we were concerned with was not whether he was drinking or not drinking. What we were concerned with was the fact that he was 150 miles away while on call at the ICU. And not what Dr. King had insinuated, that that's not how it worked. So the problem with this argument is, Dr. Burns is saying, he did have somebody filling in for him whenever he was ordering these drinks. Dr. Burns said that in a responsive self-serving declaration where he doesn't even identify the doctor. So we can verify it. Doesn't even identify the doctor who was allegedly on call for him. All affidavits are self-serving. There's no problem with self-serving affidavits unless there is sham. But back to the drinking point. Dr. King never said that she saw Dr. Burns drinking. She testified to that effect. Peter Sabe said Dr. King never said anything that he was drinking. When Ms. Eklund testified as the corporate representative, she testified that her entire basis for testifying was based on this topic, was a conversation she had immediately before the deposition with Mr. Sabe. So it's clear that when she said that he was seen drinking, that was just a misremembering of that testimony. It's a misremembering about her conversation with general counsel rather than asking the guy, were you drinking? This is after the 2020 hindsight after the fact. The question is, is did the investigators reasonably believe this to be true? And those investigators, mind you, would have had the. The reason they believed it was true because they hadn't done their homework. That's the reason. If I could, the reason they believed it true, Judge Kelly, was because that wasn't the only point of evidence that they had that was uncontroverted. The next one being. The other acts, the peer review committee, that disappeared, and that was originally one of the four areas that disappeared because he had not done away with the. But they never talked to him about that. They found that out on their own. No, I disagree. Well, I agree with you that they didn't talk to him about. OK. And then the next thing was his care of patients. And those those cases were submitted. And they found out he did take care of all the patients and that he did not not comply with with the standard of care. So again, they didn't ask him about that. They found that out later on.  If everything they did was was without Dr. Byrne. Subsequently, that is correct. Dr. Burns. They knew that Dr. Burns position. Any idea what was going on? And they hired him earlier after it for another contract. And in lieu of doing anything on the on the alleged Miss Miss malpractice, if you want to call it that, they had investigated that and rehired him. And they're bringing that back up again. Well, if I could, again, two different hats. You had the local administration, Scott Taylor, the CEO, who received testified about receiving multiple complaints, including the April 19th, 2019 complaints about Dr. Burns, which reappeared in the KBHA complaint. The people making the decision, those with censure here in Denver at the corporate level, never received information about that. It was never escalated. So what? Well, it's important because the timing. It's not important. We look back to what they had to rely on and they relied on something that was totally, totally neglected. If I mean, if I go tell the corporate officer, yeah, I saw him drunk driving and he relies on that and doesn't call up and try to investigate himself, that he can't be just, you know, excused from from violating the law. Oh, I didn't know. That's what you're arguing. They didn't know. No, I'm arguing that they made the decision based on valid information that corroborated the complaints in the KBHA complaint from multiple sources. Dr. King's testimony. Dr. Arroyo, who trained every surgeon in the state of Kansas that graduated from University of Kansas Med School for 32 years. What's missing? Well, according to the questions, the subsequent interview with Dr. Burns, but as I pointed out. Oh, yeah, gee whiz. As I pointed out in Riggs, the failure to do a follow up interview with Dr. Burns is not fatal, is not proof of pretext, and is not the type of gross deviation from standard operating procedures that would justify finding a pretext. Thank you. Thank you, counsel. In my short amount of time that I have left, in addition to the fact that the court is obviously very in tune with about Dr. Burns not being asked anything to respond to or provide insight on any of the reasons that they now are relying on for retaliation, the defendants, they conducted the investigation behind his back. But beyond that, the witnesses that they did interview, when we deposed them, they testified that we didn't say these things. So not only did they not get the perspective from Dr. Burns that would have resolved and cleared this up because they were upset with regard to the complaint about Dr. Kessler and the sexual harassment, but the witnesses didn't even tell them what they then later reported on to the ultimate decision maker. They supposedly had said, and the witnesses, when given the chance to testify, said, we didn't say those things. And that's cited in the record in our brief. How about, what's a good example? One good example would be that Green Sheetwood said that the evidence with regard to patient abandonment came from Dr. Dunford. Dr. Dunford was specifically asked about that in the deposition, and she said that was not true. Another one would be Dr. King, who Apple East Council talked about, and, well, she saw Dr. Burns 150 miles away, but what Dr. King said was when she was asked in her deposition, gosh, I didn't really know whether he was on call or not. I assumed he was, but I don't even know. That's what she testified that she told the interviewers, Green Sheetwood and Peter Sabe. And there's other examples where the underlying information that was provided by the witnesses during the so-called investigation doesn't line up with what they later claimed that those witnesses supposedly said, as heard by the witnesses' own mouth during depositions. And I believe my time is up. I'm afraid it is. We would just ask that the case be reversed and summary judgment denied and the case sent to trial. Thank you, counsel. Thank you to both of you this morning. We appreciate the arguments. The case will be submitted. Counsel are excused, and the court will stand in recess until tomorrow morning at 9 o'clock. Thank you.